UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CAROL S. JACOBSON,

                    Plaintiff,                        16 Civ.

          vs.                                         COMPLAINT

CAPITAL ONE FINANCIAL CORPORATION,                    PLAINTIFF DEMANDS
                                                      A TRIAL BY JURY
                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          Plaintiff Carol S. Jacobson ("Jacobson" or "plaintiff"), by her attorneys, Vladeck,

Raskin & Clark, P.C., complains of defendant Capital One Financial Corporation ("Capital One"

or "defendant") as follows:

## NATURE OF CLAIMS

          1.      Jacobson, a 62 year old woman, worked successfully for Capital One for

more than 10 years.  In late 2013, Jacobson was diagnosed with cancer.  After she took leave for

related surgery and subsequent chemotherapy sessions, defendant discriminated and retaliated

against her, reduced her bonus and, rather than offer a reasonable accommodation for her

disability, placed Jacobson on a performance improvement plan.  When she tried to transfer into

other positions within Capital One, defendant blocked her applications.  Shortly after she

complained of discrimination, defendant fired Jacobson, claiming falsely that it eliminated her

position as part of a restructuring.  In fact, defendant used the restructuring to rid itself of three of

its oldest employees, including plaintiff.

          2.      Jacobson brings this action to remedy defendant's unlawful discrimination

on the basis of her disability and retaliation, including the failure to accommodate, in violation of

the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"); and the New York

State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "State Law"); and to remedy discrimination on the basis of her age, and retaliation for her opposition to unlawful practices, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"); and the State Law.

       3.     Jacobson also brings this action to remedy defendant's unlawful discrimination and retaliation against her for exercising her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (the "FMLA").

       4.     Jacobson seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to the ADA, the ADEA, the FMLA, and the State Law.

JURISDICTION AND VENUE

       5.     This Court has jurisdiction under 28 U.S.C. § 1331; 42 U.S.C. § 12117; 29 U.S.C. § 626(c); and 29 U.S.C. § 2617. This Court also has diversity jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

       6.     The Court has supplemental jurisdiction over plaintiff's State Law claims pursuant to 28 U.S.C. § 1367, because these claims closely relate to her ADA, ADEA and FMLA claims and arise from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

       7.     Venue is proper in this District pursuant to 42 U.S.C. § 12117 and 42 U.S.C. 2000e-5(f)(3) because the Southern District of New York is a "judicial district in the State in which the unlawful employment practice is alleged to have been committed . . . ."

2

8.      Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC") against defendant on September 17, 2015. On May 3, 2016, the EEOC issued plaintiff a notice of right to sue.  Plaintiff has complied fully with the administrative prerequisites of the ADA and ADEA.

### PARTIES

9.      Jacobson worked for Capital One from October 2004 until September 2015, when Capital One terminated her employment.  She is a citizen of New York State.

10.     Capital One is one of the largest bank holding companies in the United States.  It has approximately 40,000 employees.  Capital One is a Delaware corporation with its headquarters in Virginia.  Capital One is an employer within the meaning of the ADA, the ADEA, the FMLA, and the State Law.

### FACTUAL ALLEGATIONS

#### Background

11.     Jacobson is a highly skilled professional with more than 30 years of commercial banking experience.  In 1976, Jacobson graduated from New York University ("NYU"), with a Bachelor of Science in Business Administration.  In 1979, she received a Master's in Business Administration from NYU's Leonard N. Stern School of Business.  She worked for several major financial institutions such as Chemical Bank, HSBC Securities, Inc., and Chase Securities, Inc., now part of JP Morgan Chase & Co.  Immediately prior to working for Capital One, she worked for the JP Morgan Private Bank as a Vice President ("VP"), Credit Products Specialist.

12.     Jacobson began working for Capital One on October 12, 2004 as a VP, Commercial Underwriter in the Small Business Financial Services Department.  In that position,

she was responsible for underwriting and monitoring risks concerning Capital One's portfolio of existing commercial loans and new loan requests from customers and prospective customers. Jacobson managed a portfolio of approximately 100 accounts.

13.     In March 2010, Capital One transferred Jacobson to the Small Business Team in the Special Assets Department (the "Department") as a Senior Manager, Senior Special Assets Account Specialist.  In that role, she reported to Steve Damore ("Damore"),VP, Special Assets.

14.     The Department was divided into teams based on market segments: Small Business; Middle Market; and Commercial Real Estate.  Each team reported to one of three senior managers:  Damore; Frank Crifasi ("Crifasi"), VP, Special Assets; and Fred Meagher ("Meagher"), VP, Special Assets.  David Horsman ("Horsman"), Managing VP, Special Assets, managed the Department.

15.     The Department handled problem loans where the borrower had either fallen behind on payments, stopped making payments, and/or filed for bankruptcy.

16.     In May 2013, Jacobson transferred to the Middle Market and Equipment Leasing Team (the "Team").  She reported directly to first-level manager John Lyons ("Lyons"), Senior Director, Special Assets Officer, who in turn reported to Crifasi.  Crifasi worked out of Capital One's New Orleans office, but traveled to New York periodically.  Horsman was Jacobson's third-level supervisor and Crifasi's direct supervisor.

17.     As a Senior Special Assets Account Specialist, Jacobson was responsible for negotiating repayment plans, reaching settlements, and managing delinquent loans through the bankruptcy process.  Her goal was to minimize Capital One's financial losses and maximize

recoveries.  In addition, she generated quarterly reports concerning loans greater than one million dollars in value.

18.     Jacobson replaced a Director level employee.  Lyons expressed surprise that Capital One had not given Jacobson the same title.

19.     Initially, Jacobson was supposed to focus on leasing accounts. The Team was overwhelmed by the size and poor quality of the leasing portfolio of accounts and required her assistance.  However, at the time of her transfer, Crifasi told Jacobson that when they were able to manage the volume of leasing work, Jacobson would begin to handle middle market accounts.

20.     Jacobson performed her job well and regularly received positive performance reviews and bonuses.  Capital One seemed to value her work.  Indeed, after her transfer to the Team, Jacobson's previous manager, Damore, told Jacobson that her replacement was a disappointment, as he could not accomplish all that she had.

<u>Capital One's Pattern of Discrimination Against Older Workers</u>

21.     Throughout Jacobson's employment, Capital One management repeatedly demonstrated a bias against older employees.  For example, while, upon information and belief, younger employees would often receive performance ratings of "Very Strong," it was difficult for older employees, including Jacobson, to earn anything above a rating of "Strong."  In 2011, Jacobson asked Damore what it took to receive the higher rating.  Damore said that the award of "Very Strong" depended on the ability of employee to come up with ideas to generate significant revenue for Capital One.  Nothing Damore mentioned had any relationship to the responsibilities of the position.  Indeed, previous iterations of Capital One's performance rating system had been the focal point of several age discrimination lawsuits, including a class action lawsuit that settled

in or around 2004.

22.     Capital One's bias against older workers was also reflected in its plans for employee training.  In 2013, based on a company-wide initiative, Jacobson's team's management held a meeting to discuss the need to continue to develop employee capabilities.  Damore told the attendees that Capital One needed to do more to develop its younger employees.

23.     Capital One's changes to its benefits plans also demonstrated its preference for younger workers.  In 2015, Capital One made significant changes to its short-term disability policy.  Prior to 2015, an employee could receive 100 percent of his salary for any covered reason depending on, among other things, the number of years worked.  However, in 2015, Capital One changed its short-term disability policy so that coverage for a leave related to pregnancy or childbirth could still be covered at 100 percent, a leave for any other disability would be covered at a maximum of 85 percent.  Upon information and belief, as mostly older employees utilized disability leave for reasons other than maternity, the change in policy had a disproportionate negative impact on those workers.

24.     In addition, over the course of Jacobson's employment, Capital One conducted several rounds of layoffs. Upon information and belief, the employees Capital One targeted were generally in their 50s, 60s, and early 70s.  Upon information and belief, Capital One generally spared its younger employees.

<u>Jacobson Begins to Experience Medical Issues</u>

25.     Between August and October 2012, Jacobson was out of the office for approximately 40 days due to a cervical fusion from a herniated disc.  However, she continued to work from home.

6

767788 v1

26.     In November 2013, Jacobson learned that she had cancer.  She advised Lyons immediately.

27.     Jacobson's cancer was very aggressive.   Accordingly, her doctor recommended that she have surgery followed by a course of chemotherapy.  Jacobson applied for short-term disability leave in early to mid-November 2013.

28.     In or about early November 2013, Jacobson applied for intermittent FMLA leave to cover her absences for surgery and for the chemotherapy sessions and the resulting side effects.

29.     Jacobson had surgery on November 18, 2013.  Despite the seriousness of her condition, she returned to work just three weeks later.

30.     December 23, 2013, was Jacobson's first day of chemotherapy.  From then until the end of February 2014, she had chemotherapy for three straight days every three weeks. Jacobson brought her laptop and BlackBerry to the sessions, so that she could continue to work. However, as Jacobson's sessions continued, the side effects worsened and it became more difficult for her to work.

<u>Capital One Places Jacobson on a Performance Improvement Plan</u>

31.     During this time, the size of the portfolio of loans the Team managed steadily increased due to the deterioration of the financial condition of Capital One's customer base.  The Team was overwhelmed by the volume of loans assigned.  Moreover, the Department often received very little information about these new loans.  As a result, becoming familiar enough with the loans in order to manage them properly was a huge strain on Jacobson's team. In addition, their next quarterly report was due on February 27, 2014.  Accordingly, Jacobson and her teammates all worked very long hours.

767788 v1

32.     However, the chemotherapy treatments caused Jacobson to feel extremely tired and physically weak.  She felt nauseated on an almost constant basis.  She also had trouble with her vision and experienced difficulties with her memory and focus.  Jacobson had previously informed Lyons of these issues.  Because of these significant side effects and the long hours Jacobson was expected to work, she transposed some numbers on one of the reporting forms she had completed.  The accuracy of the numbers in one document can ultimately affect the credit risk rating of the portfolio.  Because of this, the Team had multiple levels of review built in.  Lyons normally reviewed and approved Jacobson's work before delivering it to Crifasi.  However, Lyons either missed Jacobson's errors or had failed to review her work altogether.

33.     In or around late February 2014, Crifasi emailed Jacobson to ask if they could discuss the mistakes she had made on the reporting form.  Although she was on her way home from her last chemotherapy session, she gave Crifasi her personal cell phone number.  He told Jacobson that the conversation could wait until she got home.  Crifasi and Jacobson went over each of the errors.  He asked Jacobson to fix them and return the report to him.

34.     A few days later, Crifasi called Jacobson again to discuss her errors on the form.  Jacobson apologized and explained to him again the effect the chemotherapy was having on her.  She said that she was doing her best given her condition and told him that she would try harder.  Instead of appreciating that she was trying to help the Team while ill, Crifasi became angry and said, "If you're not healthy enough, you shouldn't be here."

35.     Crifasi returned to the New York office in mid to late March 2014.  He called Jacobson into Lyons's office and asked about her health.  Crifasi said that he and Horsman were concerned about Jacobson's health.  Jacobson told Crifasi that she was doing much better and that she was cancer-free.  Crifasi said that it was good that Jacobson was cancer-free, but

8

that her work was not acceptable.  Jacobson reminded him how the chemotherapy affected her and again apologized.  Crifasi said that if Jacobson could not do her work, she should have taken disability leave.  He added that he now questioned all of Jacobson's work.  However, prior to this conversation Crifasi had never expressed any concerns about Jacobson's work.  Moreover, all of Jacobson's previous work had been approved by Lyons.

36.     Crifasi told Jacobson that he had decided to place her on an informal performance improvement plan.  He said that he would not involve Human Resources ("HR") and that nothing would go into her file.  Crifasi said that there was no need to put anything in writing yet.

37.     Jacobson approached Lyons to discuss Capital One's decision to place her on a performance plan.  She said, "I just had chemo.  How can they do this to me?"  Lyons told Jacobson that he had fought with Horsman and Crifasi about the decision and "lost."

38.     On or about April 7, 2014, Crifasi returned to the office.  He requested to meet with Jacobson and Lyons regarding his concerns about Jacobson's performance.  Jacobson asked Lyons if he knew what Crifasi's plan would entail; Lyons said only that the plan would be "objective."

39.     On April 8, 2014, Jacobson met with Crifasi and Lyons again.  Crifasi gave Jacobson a Coaching Plan (the "Plan").  He said that because Jacobson had said that the issues with her work were a result of her illness, he expected Jacobson's performance to improve.

40.     Crifasi and Lyons then reviewed the Plan with Jacobson in detail.  The Plan was much broader than Crifasi and Lyons had previously described.  It seemed to cover every responsibility Jacobson had.  When she asked Crifasi why the Plan was so expansive, Crifasi said that Jacobson's prior work had been "barely acceptable."

9

41.     Prior to this meeting, no one had criticized Jacobson's work to this extent. To the contrary, Jacobson's work had been reviewed and approved by Lyons.

42.     Crifasi asked Jacobson to sign the Plan, but she told him that she needed time to review the document.  Crifasi said that Jacobson could have one day to review the Plan and sign it.

43.     The next day, April 9, 2014, Jacobson met with Crifasi and Lyons again. Jacobson told Crifasi that she felt that he did not want her to succeed in her role.  She said that the Plan, which covered every aspect of Jacobson's role, seemed to reflect a belief that all of her work needed improvement.  Crifasi reiterated that Jacobson's work during the past quarter had not been satisfactory.  Jacobson agreed with Crifasi that some of her work was not at her usual standards and repeated that any purported issues were because of her medical issues.  Jacobson told him that after everything she had been through with her health, being placed on the Plan was very difficult for her.  Crifasi said that the Plan was to be used as a blueprint to help Jacobson improve her performance.  He said that if after 90 days he saw no improvement in Jacobson's performance, he would place her on a formal plan.

44.     Jacobson did not understand how Crifasi could find fault with her overall performance.  Indeed, for 2013, Capital One had rated her performance as "Strong," which indicated that her 2013 managers (both Damore and Lyons) had found her work to be, at a minimum, satisfactory.  Jacobson had even received a merit bonus.  However, the bonus she received was prorated.  Damore told Jacobson that it was because Jacobson took medical leave.

45.     As part of the Plan, Crifasi was supposed to hold weekly calls with Jacobson to provide her with "coaching" on her performance.  Although they had weekly calls during this period, those calls merely consisted of Jacobson reporting to Crifasi and Lyons

767788 v1

details of her workload.  Neither Crifasi nor Lyons attempted to provide Jacobson with any coaching or feedback on her work.

46.     Although Crifasi said that he would evaluate Jacobson's performance on the Plan after 90 days, she did not hear from him.  Later, when she requested that Lyons ask Crifasi for an evaluation of her performance, Crifasi told Lyons that Jacobson had performed well enough to be removed from the Plan.  Indeed, according to Lyons, Crifasi acknowledged that Jacobson had done everything Crifasi had asked of her.  However, both Crifasi and Lyons refused to provide any of this information to Jacobson in writing.

47.     Despite Jacobson meeting Crifasi's requirements, Crifasi removed from Jacobson all of the accounts that required reporting; that is, any account worth more than one million dollars.  Capital One never assigned another large account to Jacobson again.

48.     Upon information and belief, Capital One did not treat other members of the Team who made the same or similar errors on quarterly reports in the same manner.

<u>Jacobson Complains of Discrimination</u>

49.     In mid-February 2015, Jacobson received a negative performance review for 2014.  Jacobson received a "Strong" rating in the Problem Solving, Customer Focus and Job-Specific Skills categories, but her managers rated her as "Inconsistent" in the six remaining areas.  Jacobson's overall rating was "Inconsistent."

50.     Jacobson was surprised by the review because any issues she had during 2014 had occurred in the first quarter of the year and, as her managers knew, were related to the side effects the chemotherapy treatments caused.  In addition, she had had little contact with Crifasi for the second half of 2014 and Lyons had never suggested that her performance was deficient.

11

51.     Moreover, in Jacobson's performance review, Capital One claimed that there were purported issues with her behavior at the Team's quarterly meetings. Indeed, the review claimed that her behavior bordered on insubordination and that senior management had complained. This was a complete fabrication. Had Jacobson's behavior at these meetings been so egregious, Capital One would not have waited several months to discipline Jacobson. The Head of Special Assets and department heads from other functions within Capital One attend those meetings. Capital One would not have allowed poor behavior in front of such a senior audience. Moreover, Jacobson had not even attended the most recent quarterly meeting, held in December 2014. Lyons had changed the meeting date at the last minute and Jacobson could not attend due to a conflicting obligation.

52.     Jacobson asked Lyons who had complained about her behavior. Lyons said that it was Crifasi. Jacobson asked him for other names, but Lyons kept repeating that it was Crifasi.

53.     Jacobson submitted a written response to the performance review. In her response, she rebutted each purported issue cited. In addition, Jacobson wrote that she believed that Capital One viewed her differently since her cancer treatment.

54.     In early March 2015, Jacobson asked Lyons for the name of the Team's assigned HR representative so that she could provide that individual with her comments. Instead of giving Jacobson the individual's name, Lyons called HR himself.

55.     Shortly thereafter, Jacobson learned that the Associate Relations group ("AR") handled any issues with performance reviews. On or about March 5, 2015, Jacobson sent an email to the AR email mailbox. AR assigned to Jacobson a representative, Lisa Barrett ("Barrett"), and they scheduled a call for the following Monday.

767788 v1

56.    During Jacobson's conversation with Barrett, she explained the side effects she experienced as a result of the chemotherapy.  Barrett told Jacobson that if Jacobson was at work and not out on leave, she should have been "working at capacity."  Barrett then told Jacobson that she would speak with Lyons and Crifasi about her review.

57.    On March 17, 2015, Jacobson sent Barrett an email to follow up on her concerns.  Jacobson asked if Barrett had reviewed her 2014 performance review; Barrett had not. The following day, Jacobson forwarded to Barrett her written response to the review and a copy of the review.

58.    Jacobson spoke with Barrett again, on or about March 27, 2015.  During the call, Barrett again said that if Jacobson was working during chemotherapy, Capital One's expectation was that she was working at 100 percent.  Jacobson told her that although Crifasi had said that Jacobson should have taken more time off, those conversations had not occurred until a few weeks after her treatment had ended.  Jacobson also told Barrett that if that was Capital One's position, either Jacobson's managers or HR should have talked to her about taking more leave or worked with her to find an accommodation that would allow her to perform her job responsibilities and deal with the side effects of her illness–particularly after Jacobson raised them as issues that were affecting her ability to work at her best level.  Instead, Crifasi placed Jacobson on his own informal performance improvement plan.  Barrett asked Jacobson to send her the Plan and said that she would meet with Lyons and Crifasi again.  She asked if Jacobson would like to be present during the meeting.  Jacobson declined and told Barrett that she was worried about repercussions from Crifasi and Lyons.

59.    On Friday, March 27, 2015, Jacobson sent Barrett the Plan as well as additional documentation rebutting purported issues cited in the negative performance review.

13

767788 v1

60.     The following Tuesday, March 31, 2015, Barrett responded to Jacobson's email.  She acknowledged Jacobson's reluctance to meet with Crifasi and Lyons, but said that she believed that it was important for Jacobson to lead the discussion surrounding her concerns regarding her performance review.  Barrett suggested that Jacobson think about participating in the next meeting with Crifasi and Lyons.

61.     That Friday, April 3, 2015, Jacobson responded to Barrett's email. Jacobson told her that she was troubled that Barrett viewed her concerns as being solely about performance.   Jacobson said that she felt Barrett was ignoring the evidence Jacobson had provided her that:

> (1) management started treating [her] differently after [she] was treated for cancer, (2) that management refused to provide [her] with appropriate accommodation for [her] disability immediately after [her] treatment and (3) that management is seeking to justify discriminatory treatment of [her] by making false or misleading statements about [her] performance.

Jacobson added that she did not think it was fair for Capital One to require her "to directly confront the managers whom [she] accuse[d] of engaging in discriminatory conduct."  Jacobson asked Barrett whether it was "a normal part of Capital One's EEO process to require those who complain of discrimination to have a face-to-face confrontation with the people who engaged in this discriminatory conduct[.]"

62.     In response, Barrett told Jacobson that she would not press the issue of Jacobson being present during the meeting with Jacobson's managers and that she would investigate all of Jacobson's allegations.  She then asked for Jacobson to provide information about her requests for an accommodation.

63.     On April 7, 2015, Jacobson sent Barrett an email stating that:

Both John and Frank were aware that I had cancer and I was

14

767788 v1

> undergoing chemotherapy. I told them that I was having some
> issues during my treatment. Those issues included my inability to
> think as clearly as normal and my issues with my vision. I was
> struggling. I asked for their understanding. I posed it in a general
> way as I hoped for a discussion as to how to make it work but they
> shut down any discussion.

Jacobson also explained that chemotherapy medicine builds in the patient's system. Because of that, the side effects intensify as treatment continues. Moreover, it takes another three to four weeks after the last treatment for the medicine to completely leave the patient's body, and even then, a patient will continue to experience side effects from chemotherapy for an indeterminate time. Finally, Jacobson again noted to Barrett that her managers' response to her medical situation was to place Jacobson on an informal performance plan.

64. On April 16, 2015, Jacobson's attorneys sent a letter to Capital One informing the company of her claims.

### Jacobson Begin to Apply for Other Positions at Capital One

65. In late April 2015, Jacobson learned that Crifasi had posted a job opening on the team for middle market work. The position was at the Director level – the level at which Lyons had indicated that Jacobson should have been hired – and listed many of the same responsibilities Jacobson already had. In addition, the position specified a preference for an employee based out of Capital One's Melville, New York office – the office out of which Jacobson was based. Jacobson applied for the position in or around May 2015. She received a rejection letter via email on June 2, 2015.

66. Shortly after Jacobson received the rejection letter for the position, Capital One altered the job posting so that a Texas location was preferred. Capital One also added a requirement for experience with energy clients. Thereafter, Capital One filled the position with an employee based in Texas who had energy experience.

767788 v1

67.     In May 2015, Jacobson applied for another position in the Department that reported to John O'Gorman ("O'Gorman"), Director, Special Assets.   In early to mid-2015, Capital One had created a team for O'Gorman to manage.   The Company separated the Taxi Medallion loan accounts from Middle Market and created a separate Taxi Medallion team.

68.     Although one position had been posted, O'Gorman had told some of Jacobson's colleagues that there were actually two openings.

69.     Before Jacobson applied, she met with O'Gorman to express her interest and discuss the position.   Because the Taxi Medallion accounts had previously been managed by the Team, Jacobson had experience working with accounts in that market segment and believed she could do well on O'Gorman's team.

70.     When Jacobson applied for the position, she saw that Capital One had altered the job posting to remove managerial responsibilities.   This change further supported Jacobson's suitability as a candidate for the position.

71.     Later, Jacobson noticed that her application had been removed from Capital One's job search system.   When Jacobson called HR to follow up on her application, the HR representative told her that the position was no longer available and that O'Gorman should have notified Jacobson that Capital One had decided to go with a different candidate.   However, upon information and belief, O'Gorman continued to interview applicants for the second position.   Indeed, the opening was still listed on the job search system.   Upon information and belief, Capital One removes job postings from the system as soon as they are filled.

72.     Upon information and belief, Capital One filled one of the positions under O'Gorman with a younger, less qualified employee who had only been with Capital One for just over one year.   Upon information and belief, O'Gorman said that "someone in senior

767788 v1

management" told him to fill the position with that male employee.  Upon information and belief, the second position under O'Gorman remained open.

Capital One Fires Jacobson When She Continues<br>to Complain of Discrimination and Retaliation

73.     On May 4, 2015, Jacobson's attorneys sent a second letter to Capital One about her claims of discrimination and retaliation.

74.     Shortly thereafter, on June 26, 2015, Capital One fired Jacobson. Jacobson received a letter informing Jacobson that Capital One was laying her off, effective September 2, 2015.  Capital One also laid off Lyons and one other employee in the Department. All three were in their 60s and were the three oldest people in the group.  Moreover, upon information and belief, Crifasi was involved in each termination decision.

75.     Upon information and belief, during a Department meeting held in mid-July 2015, Meagher, who replaced Horsman as Head of Special Assets in July 2014, noted that the Department had grown from 42 to 44 employees (despite the layoffs).  He said that due to the volume of work and the stress his staff was experiencing, Capital One planned to hire additional employees.

76.     Indeed, upon information and belief, during a subsequent conference call held in July 2015, O'Gorman reiterated to Meagher that Capital One needed to hire another employee for his team because they were "drowning" in work.

77.     Despite this, Capital One refused to consider Jacobson for any of the open positions.

767788 v1

FIRST CAUSE OF ACTION

Disability Discrimination under the ADA

78.    Plaintiff repeats and realleges paragraphs 1 through 77 as if fully set forth herein.

79.    Plaintiff was, at all relevant times, a "qualified individual" with a "disability" within the meaning of the ADA.

80.    By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the ADA.

81.    Defendant knew that its actions constituted unlawful discrimination under ADA and/or acted with malice or reckless indifference to plaintiff's statutorily protected rights.

82.    As a result of defendant's discriminatory acts, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

SECOND CAUSE OF ACTION

Disability Discrimination Under the State Law

83.    Plaintiff repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

84.    Plaintiff was, at all relevant times, a person with a "disability" within the meaning of the State Law.

85.    By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the State Law.

18

767788 v1

86.     As a result of defendant's discriminatory acts, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

THIRD CAUSE OF ACTION

Age Discrimination Under the ADEA

87.     Plaintiff repeats and realleges paragraphs 1 through 86 as if fully set forth herein.

88.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the ADEA.

89.     Defendant knew that its actions constituted unlawful discrimination and/or acted with malice or reckless indifference to plaintiff's statutorily protected rights.  Defendant's acts were willful within the meaning of the ADEA.

90.     As a result of defendant's willful and unlawful conduct, plaintiff has suffered lost wages.

FOURTH CAUSE OF ACTION

Age Discrimination Under the State Law

91.     Plaintiff repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her age, in violation of the State Law.

93.     As a result of defendant's discriminatory acts, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

### Retaliation Under the ADA

94.     Plaintiff repeats and realleges paragraphs 1 through 93 as if fully set forth herein.

95.     By the acts and practices described above, defendant has retaliated against plaintiff for her opposition to unlawful employment practices, in violation of ADA.

96.     Defendant knew that its actions constituted unlawful retaliation and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.

97.     As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION

### Retaliation Under the ADEA

98.     Plaintiff repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

99.     By the acts and practices described above, defendant has retaliated against plaintiff for her opposition to unlawful employment practices, in violation of the ADEA.

100.    Defendant knew that its actions constituted unlawful retaliation and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.   These violations were willful within the meaning of the ADEA.

767788 v1

101.     As a result of defendant's willful and unlawful conduct, plaintiff has suffered lost wages.

## SEVENTH CAUSE OF ACTION

### Retaliation Under the State Law

102.     Plaintiff repeats and realleges paragraphs 1 through 101 as if fully set forth herein.

103.     By the acts and practices described above, defendant has retaliated against plaintiff for her opposition to unlawful employment practices, in violation of the State Law.

104.     As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to her reputation unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION

### Retaliation Under the FMLA

105.     Plaintiff repeats and realleges paragraphs 1 through 104 as if fully set forth herein.

106.     By the acts and practices described above, defendant discriminated and retaliated against plaintiff for exercising her rights, in violation of the FMLA, 29 U.S.C. § 2615(a)(2).

107.     Defendant knew that its actions violated the FMLA.   Defendant's violations of the FMLA were willful and not in good faith.

108.     As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury and other monetary damages unless and until this Court grants relief.

767788 v1

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the ADA, the ADEA, the FMLA, and the State Law;

b.      enjoining and permanently restraining these violations of the ADA, the ADEA, the FMLA, and the State Law;

c.      directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d.      directing defendant to place plaintiff in the position she would have occupied but for defendant's unlawful discriminatory and retaliatory conduct and to make her whole for all earnings and other benefits she would have received but for defendant's unlawful treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.      directing defendant to pay plaintiff compensatory damages, including damages for mental anguish, humiliation, and pain and suffering and interest thereon under the ADA and State Law;

f.      directing defendant to pay plaintiff punitive damages for its intentional disregard of and/or reckless indifference to plaintiff's statutory rights under the ADA;

g.      directing defendant to pay plaintiff liquidated damages under the ADEA and the FMLA;

h.      awarding plaintiff such interest as is allowed by law and damages to compensate for any adverse tax consequences of any award;

22

i.      awarding plaintiff the costs of this action together with reasonable attorneys' fees pursuant to the ADA, the ADEA, and the FMLA;

j.      awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
        August 3, 2016

VLADECK, RASKIN & CLARK, P.C.

By: _____
        Anne L. Clark
        Renay M. Oliver
        Attorneys for Plaintiff
        565 Fifth Avenue, 9th Floor
        New York, New York 10017
        (212) 403-7300

767788 v1